## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 08 B 01548 |
| | ) | Chapter 7 |
| BARRY E. BURKE, | ) | Judge John H. Squires |
| | ) | |
| Debtor. | ) | |
| | ) | |
| COLEMICHAEL INVESTMENTS, | ) | Adversary No. 08 A 00252 |
| L.L.C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BARRY E. BURKE, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION

This matter comes before the Court on the complaint objecting to the discharge of a

debt filed by ColeMichael Investments, L.L.C. ("ColeMichael") against the debtor, Barry E.

Burke ("Burke"). The complaint seeks a finding that the debt reflected by a default judgment

entered by the District Court of Dallas County, Texas on March 11, 1999 (the "Final Default

Judgment") is not dischargeable under 11 U.S.C. § 523(a)(2)(A), § 523(a)(4), and §

523(a)(6). Count I of the complaint alleges that Burke is collaterally estopped from

re-litigating the issues of non-dischargeability of the debt reflected by the Final Default

Judgment. Counts II through IV of the complaint seek a determination that the debt owed

by Burke to ColeMichael is non-dischargeable under § 523(a)(2)(A), § 523(a)(4), and §

523(a)(6), respectively.

-2-

For the reasons set forth herein, the Court holds that ColeMichael has failed to establish the elements required to apply collateral estoppel to the Final Default Judgment. ColeMichael has also failed to prove that the debt falls within the exceptions to discharge under §§ 523(a)(2)(A) or 523(a)(6). Consequently, Counts I, II, and IV of ColeMichael's complaint are dismissed. The Court finds that ColeMichael has demonstrated by a preponderance of credible evidence that the debt was caused by Burke's defalcation while acting as ColeMichael's fiduciary. The Court, therefore, holds that the debt in the principal amount of $21,178,261 reflected by the Final Default Judgment is non-dischargeable under § 523(a)(4). In addition, the Court finds that interest in the amount of $34,565,369.51 is non-dischargeable. The Court grants judgment in favor of ColeMichael on Count III of the complaint in the total sum of $55,743,630.51.

## I.  JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334(a) and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. It is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (I), and (O).

## II.  UNDISPUTED FACTS AND BACKGROUND

Previously, this Court issued a Memorandum Opinion in this matter wherein it denied ColeMichael's motion for judgment on the pleadings and set this adversary proceeding for trial. *ColeMichael Invs., L.L.C. v. Burke* (*In re Burke*), 398 B.R. 608 (Bankr. N.D. Ill. 2008). In that Opinion, the Court set forth the undisputed facts as well as the

-3-

applicable law. *Id.* Those findings of facts and conclusions of law are incorporated here by reference. The Court ultimately denied the motion for judgment on the pleadings because not all of the elements of collateral estoppel had been met. *Id.* at 626-28. On February 23, 2009, this Court issued another Memorandum Opinion that denied ColeMichael's motion to reconsider denial of the motion for judgment on the pleadings and for summary judgment because material issues of fact existed as to the requisite elements of the dischargeability claims. *ColeMichael Invs., L.L.C. v. Burke (In re Burke)*, Nos. 08 B 01548, 08 A 00252, 2009 WL 435099 (Bankr. N.D. Ill. Feb. 23, 2009). The Court rejected ColeMichael's argument that the Final Default Judgment meets the "actually litigated" requirement for the application of collateral estoppel. *Id.* at *3-4.

The matter was scheduled for trial on May 4, 2009. The parties stipulated to facts and evidence in lieu of live testimony and evidentiary presentation at trial. In addition to the pleadings of record in this matter, the following documents were offered by ColeMichael and received into evidence at trial: participation agreement dated October 1, 1996, with accompanying addenda (Ex. No. 1); letters from Burke to ColeMichael from June 13, 1997 though May 29, 1998 (Ex. Nos. 2-11, 13 & 14); letter from Bayvest to ColeMichael dated May 2, 1998 (Ex. No. 12); transcript of deposition of Burke taken at the Cook County jail on October 5, 2005 (Ex. No. 25); citation to discover assets served upon Burke and filed in Cook County (with attachments) (Ex. No. 28); answer to rider to citation to discover assets filed by Burke dated November 27, 2002 (Ex. No. 29); and Burke's reply to rider to citation to discover assets (Ex. No. 30). Some of these exhibits were not previously furnished in connection with the motions for judgment on the pleadings and summary judgment. Most

-4-

of the facts and background are undisputed.  The following facts are taken from the parties'

stipulations and from all evidence, public records, and proceedings to which the parties refer.

ColeMichael is a limited liability company organized under the laws of the State of

Nevada with its principal place of business located in Dallas, Texas.  (Stipulation dated April

24, 2009 ("Stipulation (4/24/09)" ¶ 1.)  Burke is an individual who resides in Lombard,

Illinois.  (Stipulation (4/24/09) ¶ 2.)  Burke was admitted to practice law in the State of

Illinois in 1976. (Stipulation (4/24/09) ¶ 4.)   On September 21, 2006, Burke was disbarred

on consent by order of the Illinois Supreme Court.  (Stipulation (4/24/09) ¶ 6.)  From his

admission until his disbarment, Burke was an Illinois attorney licensed to practice law in the

State of Illinois, and admitted to the bars of the Illinois Supreme Court and the United States

District Court for the Northern District of Illinois.  (Stipulation (4/24/09) ¶ 5.)

On October 2, 1996, ColeMichael entered into a joint venture participation agreement

("participation agreement") with a company known as Bayvest Capital Funding Limited

("Bayvest").  (Stipulation (4/24/09) ¶ 8.)  Burke agreed to serve as legal counsel for the joint

venture created to invest in the "high yield capital enhancement strategy." (Stipulation

(4/24/09) ¶ 9).  The participation agreement stated in relevant part:

> THE BUSINESS AFFAIRS OF THE VENTURE SHALL BE
> MANAGED, DIRECTED AND ADMINISTERED BY
> BAYVEST, WHICH SHALL ACT IN A FIDUCIARY
> CAPACITY FOR THE VENTURE.
> BAYVEST SHALL HAVE THE SOLE RESPONSIBILITY
> AND THE EXCLUSIVE RIGHT AND AUTHORITY TO
> MANAGE AND ADMINISTER (*WITH THE POWER TO
> DELEGATE SUCH RIGHT AND AUTHORITY IN WHOLE
> OR IN PART TO OTHERS*) THE IMPLEMENTATION,
> OPERATION AND COMPLETION OF THE PLAN, AND
> IN THAT   REGARD, TO NEGOTIATE, SIGN AND

-5-

> DELIVER ON BEHALF OF THE VENTURE ALL
> CONTRACTS, INSTRUCTIONS AND ANY OTHER
> DOCUMENTS WHATSOEVER, TO OPEN AND
> OPERATE BANK ACCOUNTS, TO PURCHASE AND
> SELL MONETARY TRANSFER INSTRUMENTS, BANK
> DEBENTURE INSTRUMENTS, SECURITIES AND
> CURRENCIES, TO RECEIVE AND DISBURSE, OR TO
> DIRECT AND CO-ORDINATE THE DISBURSEMENT OF,
> PROFITS AND TO EXERCISE ALL RIGHTS AND MAKE
> AND DO ALL ARRANGEMENTS NECESSARY OR
> INCIDENTAL TO THE IMPLEMENTATION,
> OPERATION AND COMPLETION OF THE PLAN FOR
> THE BENEFIT OF THE VENTURE.

(Ex. No. 1 §§ 3.1-3.2.) (emphasis added).

Addendum A to the participation agreement stated in relevant part:

> THE FUNDER WILL PROVIDE FOR INVESTMENT IN
> THE PLAN THE SUM OF THREE HUNDRED
> THOUSAND UNITED STATES DOLLARS . . . (the
> "INVESTMENT AMOUNT") TOGETHER WITH AN
> ADDITIONAL ONE THOUSAND DOLLARS . . . (the
> "EXPENSE FUND") *AS A RETAINER* FOR BARRY E.
> BURKE, ATTORNEY AND COUNSELOR AT LAW. . .
> (the "LEGAL COUNSEL").

(Ex. No. 1 Addendum A § 2.1.) (emphasis added).

Addendum B to the participation agreement stated in relevant part as follows:

> ALL DISTRIBUTIONS OF INCOME OF THE VENTURE
> TO THE PARTIES SHALL BE MADE THROUGH THE
> DISTRIBUTION ACCOUNT OPERATED UNDER THE
> EXCLUSIVE SIGNATORY AUTHORITY OF THE LEGAL
> COUNSEL OR THE CLIENT TRUST ACCOUNT OF
> SUCH OTHER LAW FIRM, BANK OR OTHER
> FINANCIAL INSTITUTION AS BAYVEST AND THE
> LEGAL COUNSEL SHALL MUTUALLY AGREE UPON....

(Ex. No. 1 Addendum B § 3.10.)

-6-

A copy of a letter of instructions sent to Burke as legal counsel for the joint venture

was attached to Addendum B of the participation agreement as "Exhibit 1: Specimen

Instructions to the Legal Counsel." (Ex. No. 1, Addendum B, Ex. No. 1 "Letter of

Instructions.") The Letter of Instructions stated in relevant part:

> Please be advised that instructions have been given to BANK
> OF AMERICA . . . to transfer the sum of US $301,000 to
> your Client Trust Account at First National Bank of
> Chicago.... These funds are being transferred to your Client
> Trust Account on and subject to the following terms and
> conditions.
>
> 1.     The sum of US $300,000 (the "INVESTMENT
> AMOUNT") is for investment in the IMF sponsored enhanced
> return strategy (the "PLAN") . . . between COLEMICHAEL
> INVESTMENTS, L.L.C. (the "FUNDER") and BAYVEST
> CAPITAL FUNDING LIMITED ("BAYVEST"). . . .
>
> 2.     The sum of US $1,000 (the "EXPENSE FUND") is
> for payment of your out of pocket expenses pertaining to the
> implementation and carrying out of the PLAN.
>
> 3.     This confirms that BAYVEST and the FUNDER have
> entered into a joint venture (the "VENTURE"). . . .
> BAYVEST has the sole responsibility and the exclusive right
> and authority to manage and administer (*with the power to
> delegate such right and authority in whole or in part to
> others*) the implementation, operation and completion of the
> PLAN. . . .
>
> 4.     You are hereby authorized and directed to comply
> with all lawful instructions of BAYVEST pertaining to the
> utilization the INVESTMENT AMOUNT in the PLAN
> subject only to the provisions set out in paragraphs 5, 6 and 7
> below . . . .
>
> 5.     The INVESTMENT AMOUNT is transferred to your
> Client Trust Account on the express condition that you will
> utilize and deal with the INVESTMENT AMOUNT in such
> manner as shall ensure that the FUNDER does not suffer any
> loss or diminution in respect of the INVESTMENT
> AMOUNT and to this end, you will not release the
> INVESTMENT AMOUNT from your control except in
> accordance with the provisions set out in ADDENDUM "B"
> of the [participation agreement].

-7-

> 6.    If the INVESTMENT AMOUNT (as part of the Combined Investment Amount) has not been invested in the PLAN within THIRTY (30) calendar days after the receipt of the INVESTMENT AMOUNT in your Client Trust Account, you hereby are authorized and directed to return it to the FUNDER upon receipt of bank co-ordinates from the FUNDER in that regard.
>
> 7.    You are further authorized and directed *for and on behalf of* the FUNDER to receive and deal with the First and Second Guarantees and the First and Second Pay Orders and the proceeds from the sale or discounting thereof, all as provided under the said ADDENDUM "B."

(*Id.*) (emphasis added). Burke, through his signature on the Letter of Instructions on October 7, 1996, confirmed acceptance of the letter and agreed to abide by the instructions. (*Id.*)

In 1996, ColeMichael transferred to Burke's client trust account the sum of $301,000 to be invested in a "high yield capital enhancement strategy." (Stipulation (4/24/09) ¶ 7.) Burke agreed to accept the funds transferred to his client trust account and ensure that ColeMichael did not suffer any loss or diminution of said funds. (*Id.* ¶ 10.) The participation agreement specifically required Burke to obtain a bank guarantee in exchange for any transfer or release of the investment funds. ( Ex. No. 1, Addendum B § 3.3(2); Ex. No. 25 p. 91 lines 21-24.) After receipt of ColeMichael's funds, Burke transferred the funds to an account established at a financial institution located outside the United States without prior notice to, or the prior approval, authorization, or consent of ColeMichael. (Stipulation (4/24/09) ¶¶ 11 & 12.) In a letter sent to ColeMichael on June 13, 1997, Burke "assumed full responsibility and authority for the disbursement of funds to ColeMichael pursuant to ... the [p]articipation [a]greement" and advised ColeMichael that although there were delays with the investment, ColeMichael could expect the funds to be disbursed no later than June

-8-

27, 1997. (Ex. No. 2.) In August of 1997, Burke represented theat there were further delays

in the transaction due to a dispute among anonymous "Arab principals" in the Middle East.

(Ex. No. 4.)  For almost two years, Burke continued to provide inconsistent statements,

excuses, and explanations for his failure to pay ColeMichael, including the following:

> The investment venture involved two oil companies which had longstanding business disputes, and that one or both of them was holding the entire investment fund hostage until certain and undisclosed differences were resolved. (Ex. No. 15 ¶ 19A; Ex. Nos. 4 & 5; Ex. No. 25 p. 87 lines 11-20.)

> The two oil companies had agreed to arbitrate their disputes in England and Burke was in Europe conducting negotiations to obtain the release of ColeMichael's funds.  (Ex. No.15 ¶ 19B; Ex. Nos. 6-8 & 13.) The negotiations were unsuccessful and the arbitration required that funds not be dispersed.  (*Id.*)

> Burke recognized that funds were due and payable to ColeMichael and the larger investors' refusal to disburse funds was inappropriate, but Burke did not want to press them to rightfully disburse ColeMichael's money.  (Ex. No. 15 ¶ 19E;  Ex. Nos. 6, 8, 9, & 11-13.)  In defense of his failure to act, Burke stated that he had the opportunity to earn much larger amounts from these investor's and wanted to protect these larger financial interests.  (*Id.*)

> Burke and Bayvest had caused another investment to grant ColeMichael an interest therein which would be "rolled" into new investments that would ultimately result in ColeMichael receiving a total return of over $20,000,000.  (Ex. No. 15 ¶ 20; Ex. No. 12; Ex. No. 25 p. 100 lines 1-3, p. 118 lines 2-11, p. 99 lines 23-24.)

-9-

> Burke had not in fact invested the initial investment fund with
> other larger investors, but the entire initial investment fund
> had been stolen in Singapore. This theft was made possible
> by Burke's failure to obtain appropriate and contractually
> required guarantees before forwarding such funds to
> Singapore. (Ex. No. 15 ¶ 19C; Ex. No. 8; Ex. No. 25 p. 95
> lines 2-8, p. 96 lines 17-21, p. 98 lines 1-11, p. 131 lines
> 12-18, p. 130 lines 1-6.)

These representations are confirmed both in writings containing Burke's signature and

Burke's deposition testimony on October 5, 2005.

On May 2, 1998, Bayvest represented that ColeMichael was to receive a "guaranteed

minimum" payment of $3,695,652 as a result of its investment. (Stipulation (4/24/09) ¶ 13.)

Bayvest further represented that Burke had assumed management of another investment plan

and ColeMichael could "fully expect" to receive a total of $18,478,261 over a one-year

period from its continued investment. (*Id.* ¶ 14; Ex. Nos. 12 & 15 ¶ 20.) On May 29, 1998,

Burke represented to ColeMichael that he had under his control a sum of money, located in

Europe, of which ColeMichael's share was $3,200,000. (Stipulation (4/24/09) ¶ 15.)

ColeMichael never received any distribution, payment, or the guaranteed return of its

principal investment due under the participation agreement. (Ex. Nos. 1, 15, & 25 p. 91 lines

9-11.) Burke is unable to produce documents related to ColeMichael's investment in the

joint venture and cannot provide an accounting for ColeMichael's funds deposited in Burke's

client trust fund. (Stipulation (4/24/09) ¶ 88.)

## A.    The Dallas County Proceedings

In 1998, ColeMichael commenced proceedings against several defendants, including

Burke, in the District Court of Dallas County, Texas, Cause No. 98-07667-D (the "Dallas

-10-

County Proceedings"). (Stipulation (4/24/09) ¶ 16; Ex. No. 32.) In the Dallas County

Proceedings, the original petition and summons were served upon the Texas Secretary of

State who then served them upon Burke by certified mail. (Stipulation (4/24/09) ¶ 17; Ex.

No. 16.) Both the original and the amended petitions were sent to Burke at his home address,

via certified mail, by the Texas Secretary of State. (Stipulation 4/24/09 ¶ 17; Stipulation

dated April 30, 2009 ("Stipulation (4/30/09);" Ex. Nos. 16 & 33.) A copy of ColeMichael's

original petition filed on October 1, 1998, has been submitted to the Court. (Ex. No. 32.)

A copy of ColeMichael's first amended original petition filed on October 13, 1998, has also

been submitted to the Court. (Ex. No. 15.) The first amended original petition was

substantively identical to ColeMichael's original petition filed in the Dallas County

Proceedings. (Ex. Nos. 15 & 32.) On November 16, 1998, ColeMichael's Texas counsel,

Theodore J. Riney, sent a letter to Burke along with a certificate of last known address filed

in the Dallas County Proceedings. (Stipulation 4/30/09; Ex. No. 34.) Burke received the

letter from Riney prior to November 30, 1998. (Stipulation (4/30/09) ¶ 4.)

　　　　In its first amended original petition, ColeMichael sought to recover damages from

Burke and his co-defendants for claims arising out of ColeMichael's investment in the joint

venture established to invest in a "high yield capital enhancement strategy" allegedly

sponsored by the International Money Fund. (Stipulation (4/24/09) ¶ 22.) The first amended

original petition alleged the following causes of action against Burke, Bayvest and several

other defendants: breach of contract; accounting; fraud; fraudulent inducement; breach of

fiduciary duty; legal malpractice; negligence; oppression of a minority venturer; and

negligence per se. (Ex. No. 15)

-11-

Specifically, in the first amended original petition, ColeMichael alleged, among other things, that Burke represented himself to be an international expert in the type of transaction ColeMichael was solicited to invest in (*id.* at ¶ 13); Burke made fraudulent misrepresentations to induce ColeMichael to invest in the transaction, including the representation that because of the "secret involvement" of the United States government the terms of the agreement were non-negotiable (*id.* at ¶¶ 14 & 25); Burke misrepresented that he had caused another investment scheme to grant ColeMichael an interest which would be "'rolled' into new investments, all of which would ultimately result in ColeMichael receiving a total return of over $20,000,000" (*id.* at ¶ 20); and Burke acted as attorney and fiduciary for ColeMichael in connection with the investment (*id.* at ¶¶ 13-16). ColeMichael further alleged that Burke made a series of misrepresentations in order to avoid payment of funds owed ColeMichael in connection with the investment. (*Id.* at ¶¶ 10 & 19.) Burke failed to appear or file an answer in the Dallas County Proceedings. (Stipulation (4/24/09) ¶ 38.)

On January 7, 1999, the Dallas County District Court entered a default judgment as to Burke (the "Default Judgment"). (Ex. No. 17.) The Default Judgment stated in pertinent part as follows:

> The Court finds and holds that Defendant Burke was duly served with process in the form, manner and within the length of time required by law. . . . Therefore, the Court holds that it has jurisdiction over Defendant Burke and the subject matter and that the time for filing an answer by Defendant Burke has passed.
> The Court has considered the pleadings and evidence presented and finds that Plaintiff ColeMichael is entitled to a default judgment against Defendant Burke in this cause and that all facts contained in Plaintiff's First Amended Original Petition are deemed admitted as to Defendant Burke.

-12-

> IT IS, THEREFORE, ORDERED, ADJUDGED AND
> DECREED that Plaintiff ColeMichael Investments, LLC,
> have and recover judgment against Defendant Barry E. Burke
> for all causes of action set forth in Plaintiff's First Amended
> Original Petition, and that ColeMichael recover of and from
> Defendant Barry E. Burke the sum of . . . ($21,178,261).

(*Id.* pp. 1-2.)

On March 11, 1999, the Dallas County District Court entered a final default judgment

as to defendants Burke, John Bright, and Bayvest (the "Final Default Judgment"). (Ex. No.

18.) The Final Default Judgment incorporated the Default Judgment. (*Id.* at p. 2.) The Final

Default Judgment stated in pertinent part as follows:

> The Court has considered the pleadings and evidence
> presented and finds that Plaintiff ColeMichael is entitled to a
> default judgment against Defendants Burke, Bright and
> Bayvest in this cause and that all facts contained in Plaintiff's
> First Amended Original Petition are deemed admitted as to
> Bright.
> IT IS, THEREFORE, ORDERED, ADJUDGED AND
> DECREED that Plaintiff ColeMichael Investments, LLC,
> have and recover judgment against Defendants Barry E.
> Burke, John Bright and Bayvest Capital Funding Limited,
> jointly and severally, for all causes of action set forth in
> Plaintiff's First Amended Original Petition, and that
> ColeMichael Investments, LLC recover of and from
> Defendants Barry E. Burke, John Bright and Bayvest Capital
> Funding Limited, jointly and severally, the sum of . . .
> ($21,178,261).

(*Id.* p. 3.)

Burke did not appeal the Final Default Judgment. (Stipulation (4/24/09) ¶ 45.) Burke

never filed with the Dallas County District Court a bill of review or other paper challenging,

seeking to vacate, or seeking to set aside the Final Default Judgment. (Stipulation (4/24/09)

¶ 55.)

-13-

**B.     The Cook County Proceedings**

    **1.     Citation to Discover Assets**

In November of 1999, ColeMichael commenced enforcement proceedings before the Circuit Court of Cook County, Illinois, Case No. 99 L 13268 (the "Cook County Proceedings"), by registering the Final Default Judgment and causing a citation to discover assets to be served upon Burke.  (Stipulation (4/24/09) ¶ 47.)  ColeMichael's citation to discover assets was duly served upon Burke and called for his appearance in answer to the citation on February 22, 2000.  (*Id.* ¶ 49.)  In addition to being an Illinois attorney, Burke has at all relevant times been represented by separate counsel in connection with the Cook County Proceedings.  (*Id.* ¶ 48.)

Prior to December 28, 1999, Burke, through his counsel, filed a motion to stay enforcement of post-judgment proceedings.  (*Id.* ¶ 50.)  In the motion to stay, Burke contended that he had not been personally served with the petition in the Dallas County Proceedings and that he intended "to challenge [the Final Default Judgment] in the Texas court which entered it by the filing of a motion to vacate or appropriate petition." (*Id.* ¶ 51.) Burke requested that the Cook County Circuit Court stay the enforcement of the Final Default Judgment.  (*Id.* ¶ 52.)  At the hearing held in the Cook County Proceedings on February 29, 2000, all matters, including the motion to stay, were continued for hearing to March 8, 2000, and Burke was ordered to personally appear in court at that continued hearing.  (*Id.* ¶ 58.)

On March 8, 2000, Burke filed a voluntary Chapter 7 bankruptcy petition.  (*Id.* ¶ 59.) The case was dismissed on April 10, 2000, due to Burke's failure to file schedules as

-14-

required under Federal Rule of Bankruptcy Procedure 1007. (*Id.* ¶ 60.) Burke was barred

from filing another bankruptcy petition without prior leave from the Court for a period of 180

days due to his abuse of the bankruptcy process. (*Id.* ¶ 61.)

On April 28, 2000, the Cook County Proceedings were reinstated from the stay in

effect as a result of Burke's first bankruptcy, and the case was removed from that court's

bankruptcy call. (*Id.* ¶ 62.) On May 5, 2000, the matter was continued by order entered by

the Cook County Circuit Court, and Burke was ordered to personally appear in court on May

31, 2000. (*Id.* ¶ 63.) Burke and his counsel of record signed an agreed order (the "Agreed

Order") to be presented to the Cook County Circuit Court at the May 31, 2000 hearing. (*Id.*

¶ 64.) The Agreed Order provided in relevant part:

> By his signature and that of his counsel below,
> judgment-debtor Barry E. Burke hereby withdraws with
> prejudice his previously-filed motion to stay post-judgment
> proceedings (filed when these proceedings were pending
> under Cause Number 99 L 13268), and consents to the
> validity and enforceability, in its entirety and before any court
> or tribunal with jurisdiction over Burke or any asset belonging
> to Burke or to which Burke is or may be entitled, of the Final
> Judgment entered by the District Court of Dallas County,
> Texas, on March 11, 1999, in Cause Number 98-07667-D
> (the "Judgment"), for which these registration and
> enforcement proceedings were commenced[.]

(Ex. No. 21 ¶ 5.) The Agreed Order further provided:

> Further, by his signature and that of his counsel below,
> judgment-debtor Barry E. Burke, acknowledges, represents
> and warrants that he has the right to receive funds which are
> sufficient to, and from which he will, satisfy the Judgment,
> and that he expects to receive said funds, and satisfy the
> Judgment, prior to the continued citation date of July 6,
> 2000[.]

-15-

(*Id.* ¶ 6.) The Cook County Circuit Court entered the Agreed Order dated May 31, 2000, and continued the citation proceedings to July 6, 2000. (Stipulation (4/24/09) ¶¶ 65 & 68.)

On November 30, 2000, in order to induce ColeMichael to continue the citation proceedings, Burke submitted an affidavit in connection with the Cook County Proceedings. (*Id.* ¶ 69.) In his affidavit, Burke stated, "I further represent, warrant, testify, and assure ColeMichael, its counsel and the Court, that I have every intention of paying, and in good faith believe that I will have the financial ability to pay, the Judgment in full together with all accrued interest no later than Jan[uary] 31, 2001." (Ex. No. 22 ¶ 5.) Based upon Burke having submitted his affidavit pursuant to the Agreed Order, the Cook County Circuit Court continued the citation proceedings. (Stipulation (4/24/09) ¶ 68.)

On July 8, 2003, Burke was ordered by the Cook County Circuit Court to appear and show cause as to why he should not be held in contempt of court for failing to comply with a prior order of that court directed to the production of responsive materials. (*Id.* ¶ 71.) On August 25, 2003, at a hearing in connection with those show cause proceedings, Burke produced a warranty deed, signed by Burke and his wife on September 2, 2002, while the citation was pending in the Cook County Proceedings. (Compl. ¶ 46; Answer ¶ 46.) The deed transferred title to Burke's residence from Burke and his wife as "joint tenants" to themselves as "tenants by the entirety." (Stipulation (4/24/09) ¶ 72.) On August 26, 2003, ColeMichael moved the Cook County Circuit Court to set aside this conveyance, arguing that the conveyance was an attempt to place Burke's asset beyond the process of the Cook County Circuit Court. (*Id.* ¶ 73.) On January 16, 2004, the Cook County Circuit Court granted ColeMichael's motion. (*Id.* ¶ 74.)

-16-

## 2.    Contempt Orders

On October 16, 2003, ColeMichael requested from the Cook County Circuit Court an order of contempt arising from Burke's failure to comply with that court's orders and his failure to justify or support his prior representations to the court. (*Id.* ¶ 75.) On June 30, 2004, the Cook County Circuit Court held an evidentiary hearing in connection with the contempt proceedings. (*Id.* ¶ 76.) At that hearing, Burke testified that he reviewed and signed the Agreed Order. (Ex. No. 23 pp. 27-28; Stipulation (4/24/09) ¶ 78.) Burke also testified that by his signature he represented and consented to the validity and enforceability of the Default Judgment entered in the Dallas County Proceedings. (*Id.*)

On October 21, 2004, the Cook County Circuit Court entered a Memorandum Decision and Order adjudging Burke to be in indirect civil contempt and direct criminal contempt of court. (Ex. No. 24; Stipulation (4/24/09) ¶ 80.) In its Memorandum Decision and Order, the Cook County Circuit Court found that, "[o]n March 11, 1999, the District Court of Dallas County, Texas, entered final judgment against Burke and in favor of ColeMichael in an ex-parte proceeding in the amount of $21,178,261.00. . . . Before this Court, Burke has conceded the validity and enforceability of this Judgment." (Ex. No. 24 ¶ 2.) The Cook County Circuit Court also made the following findings:

> The Court expressly finds that the representation made in the Agreed Order of May 31, 2000, that Burke had an existing right to receive funds sufficient to enable him to satisfy the Judgment, was false, and knowingly so.
> The Court further expressly finds that Burke's representation, warranty and testimony, made to this Court under oath in the affidavit he submitted on November 30, 2000, that he had a good faith basis for believing that he would have the financial ability to pay the Judgment, together with all accrued interest,

-17-

no later than January 31, 2001, was false, and knowingly so.
The Court further expressly finds that the statement made in
open court on April 16, 2004, that Burke's prior
representations regarding a right to receive funds sufficient to
satisfy the Judgment were premised upon a written contract,
were false, and knowingly so.

The Court further expressly finds that the representation made
by Burke at the May 28, 2004, hearing, that he was entitled to
commission income from an imminent sale, was false, and
knowingly so. . . .

[T]he Court further expressly finds that the purported 2002
transfer by Burke of his interest in real estate was undertaken
by him solely in an attempt to avoid paying the debt reflected
by the Judgment, and place the subject real estate beyond the
enforcement powers of this Court.  Said transfer was also in
direct violation of this Court's citation. . . .

The evidence and testimony show that Burke has produced no
contract or other document which supports the representation
that he had an existing right in 2000 to receive funds which
would enable him to satisfy the Judgment.

In short, the Court finds that Burke has deliberately and
repeatedly lied to the Court, engaged in a continuing and
contumacious pattern of disregard for the Court's direct
orders, and attempted to frustrate the intended process of the
Court.

The aforesaid conduct by Burke was knowing and wilful, an
affront to the dignity and integrity of this Court, and an effort
to obstruct justice.  This conduct is made particularly
egregious by the fact that Burke is an Illinois attorney and an
officer of this Court.

(*Id.* ¶¶ 42-45 & 48-51.)

The Court ordered Burke "to pay all reasonable attorneys' fees and expenses incurred

by ColeMichael in these enforcement proceedings since May 31, 2000, in an amount to be

determined at a subsequent hearing upon ColeMichael's petition[.]"  (*Id.* p. 29 ¶ 4.)  The

matter was continued for Burke to appear in court to begin his incarceration for the civil

contempt on October 28, 2004.  (*Id.* p. 29 ¶ 5.)  Burke did not appeal the Cook County

Circuit Court's Memorandum Decision and Order. (Stipulation (4/24/09) ¶ 81.) On October

5, 2005, a deposition of Burke was taken at the Cook County jail. (Ex. No. 25.)

On November 28, 2006, the Cook County Circuit Court again found Burke to be in

contempt of court for having made willful and contumacious misrepresentations to the court.

(Ex. No. 26; Stipulation (4/24/09) ¶ 84.)  The court ordered Burke incarcerated in the Cook

County jail for a period of six months.  (*Id.*)  The matter was continued for status to May 22,

2007. (Ex. No. 26 ¶ 12.) Burke filed a notice of appeal from the second finding of contempt.

(Stipulation (4/24/09) ¶ 85.)  On January 8, 2008, that appeal was dismissed for want of

prosecution by the Illinois Appellate Court for the First District.  (*Id.* ¶ 86.)

On January 24, 2008, Burke filed a second voluntary Chapter 7 bankruptcy petition.

(*Id.* ¶ 89.)  Thereafter, on May 5, 2008, ColeMichael filed the instant four-count complaint.

Count I alleges that Burke is collaterally estopped from re-litigating the issue of

non-dischargeability of the debt reflected by the Final Default Judgment under §

523(a)(2)(A), § 523(a)(4), and § 523(a)(6) because these issues were litigated and decided

in the Dallas County Proceedings and the Cook County Proceedings.   Specifically,

ColeMichael alleges that Burke had a full and fair opportunity to participate in the Dallas

County Proceedings and the Cook County Proceedings and to litigate the issues raised

therein.   ColeMichael further alleges that the Dallas County Proceedings and the Cook

County Proceedings involved the same parties and issues as this proceeding. ColeMichael

argues that the Final Default Judgment was a final judgment on the merits and that Burke

conceded to its validity in the Cook County Proceedings. Burke argues that the Final Default

Judgment did not require a full and fair litigation and therefore does not comply with

-19-

collateral estoppel under Texas or Illinois law. Burke further argues that affirming the validity of a default judgment is not an admission of the allegations found in the first amended original petition from the Dallas County Proceedings. Alternative to the relief requested in Count I, ColeMichael requests relief under § 523(a)(2)(A) (Count II); § 523(a)(4) (Count III); and § 523(a)(6) (Count IV). ColeMichael contends that Burke's conduct, as alleged in the Dallas County Proceedings, meets the requisite elements of non-dischargeability under § 523(a)(2)(A), § 523(a)(4), and § 523(a)(6), and this conduct created the debt that is the subject of this dispute.

## III. DISCUSSION

### A.  Collateral Estoppel

The Court has previously rejected ColeMichael's arguments to apply the doctrine of collateral estoppel. *Burke*, 398 B.R. at 626-28; *Burke*, 2009 WL 435099, at *3-4. The additional points raised by ColeMichael since the Court authored those two decisions do not cause the Court to change its opinion. In short, ColeMichael's attempt to step together the Final Default Judgment entered in Texas and the contempt order entered in Illinois is inappropriate for proper application of collateral estoppel.

The Court again rejects ColeMichael's argument that the Final Default Judgment meets the "actually litigated" requirement for the application of collateral estoppel. Pursuant to Texas law, a default judgment does not meet the "actually litigated" prong of collateral estoppel unless the state court record reflects "the finding made and the supporting facts so that the bankruptcy court may determine that the pertinent issue was litigated and decided."

-20-

*Caton v. Trudeau*, 157 F.3d 1026, 1029 (5th Cir. 1998). The Final Default Judgment was entered against Burke after he failed to answer the complaint filed in the Dallas County Proceedings. The Texas court did not make any detailed factual findings sufficient for this Court to determine whether all the requisite elements for the dischargeability claims have been met. It is this lack of specific factual findings by the Texas court that make it impossible for this Court to apply collateral estoppel to the Final Default Judgment.

The Final Default Judgment does not contain any finding that Burke committed all requisite elements of ColeMichael's claims against him based on § 523(a)(2)(A), § 523(a)(4), or § 523(a)(6). The Final Default Judgment does not expressly find that Burke committed fraud, was a fiduciary, or that his actions were willful and malicious. Even though these allegations were made in the complaint, the Texas court did not make specific findings that Burke committed fraud, was a fiduciary, or acted in a willful and malicious manner. A statement by the state court that facts contained in a complaint are deemed admitted is not tantamount to those facts and issues being actually litigated. Furthermore, no transcripts from the Dallas County Proceedings have been submitted. Thus, the Court cannot determine what evidence was actually presented to and considered by the Texas court.

Burke's subsequent consent to the validity and enforceability of the Final Default Judgment in the Cook County Proceedings does not change the fact that the Texas court did not make any factual findings in the Judgment. Moreover, the subsequent post-judgment proceedings in Illinois and that court's findings cannot serve to supplement or augment the Texas court's judgment and the lack of requisite factual findings there. ColeMichael has failed to demonstrate that the doctrine of collateral estoppel applies with respect to the Final

-21-

Default Judgment and the factual allegations found in the first amended original petition. Therefore, Count I of the complaint is hereby dismissed. An independent determination is required to ascertain whether Burke's conduct, as alleged in the first amended original petition, meets the requisite elements for a finding of non-dischargeability under § 523.

**B.     Exceptions to the Discharge of a Debt**

The discharge provided by the Bankruptcy Code is meant to effectuate the "fresh start" goal of bankruptcy relief. *Vill. of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002). The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *Goldberg Secs., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992); *Banner Oil Co. v. Bryson (In re Bryson)*, 187 B.R. 939, 957 (Bankr. N.D. Ill. 1995). The United States Supreme Court has held that the burden of proof required to establish an exception to discharge is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). *See also In re McFarland*, 84 F.3d 943, 946 (7th Cir. 1996); *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir.1994). Exceptions to discharge are to be construed strictly against a creditor and liberally in favor of a debtor. *In re Morris*, 223 F.3d 548, 552 (7th Cir.2000); *Kolodziej v. Reines ( In re Reines)*, 142 F.3d 970, 972-73 (7th Cir.1998); *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir.1985). "The statute is narrowly construed so as not to undermine the Code's purpose of giving the honest but unfortunate debtor a fresh start." *Park Nat'l Bank & Trust of Chi. v. Paul (In re Paul)*, 266 B.R. 686, 693 (Bankr. N.D. Ill. 2001).

-22-

### 1.    11 U.S.C. § 523(a)(2)(A)

Section 523 of the Bankruptcy Code enumerates specific, limited exceptions to the

dischargeability of debts.  Section 523(a)(2)(A) provides as follows:

> (a) A discharge under section 727 . . . does not discharge an
> individual debtor from any debt–
> > (2) for money, property, services, or an
> > extension, renewal, or refinancing of credit, to
> > the extent obtained by–
> > > (A) false pretenses, a false
> > > representation, or actual fraud,
> > > other than a statement
> > > respecting the debtor's or an
> > > insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A).

Section 523(a)(2)(A) lists three separate grounds for dischargeability: actual fraud,

false pretenses, and a false representation.  *Id.*; *Bletnitsky v. Jairath (In re Jairath)*, 259 B.R.

308, 314 (Bankr. N.D. Ill. 2001).  A single test is applied to all three grounds even though

the elements for each exception vary under common law.  *Jairath*, 259 B.R. at 314.

### a.    False Pretenses or False Representation

In order to except a debt from discharge due to false pretenses or a false

representation under § 523(a)(2)(A), a creditor must establish the following elements: (1) the

debtor made a false representation of fact (2) which the debtor (a) either knew to be false or

made with reckless disregard for its truth and (b) made with an intent to deceive; and (3) the

creditor justifiably relied on the false representation.  *Baker Dev. Corp. v. Mulder (In re*

*Mulder)*, 307 B.R. 637, 643 (Bankr. N.D. Ill. 2004); *Bednarsz v. Brzakala (In re Brzakala)*,

305 B.R. 705, 710 (Bankr. N.D. Ill. 2004).  To prevail on a § 523(a)(2)(A) complaint, all

-23-

three elements must be established. *Glucona Am., Inc. v. Ardisson* (*In re Ardisson*), 272 B.R.

346, 357 (Bankr. N.D. Ill. 2001). Failure to establish any one fact is outcome determinative.

*Jairath*, 259 B.R. at 314.

False pretenses in the context of § 523(a)(2)(A) include implied misrepresentations

or conduct intended to create or foster a false impression. *Mem'l Hosp. v. Sarama (In re

Sarama)*, 192 B.R. 922, 927 (Bankr. N.D. Ill. 1996). The Court has defined false pretenses

as follows:

> [A] series of events, activities or communications which,
> when considered collectively, create a false and misleading
> set of circumstances, or false and misleading understanding
> of a transaction, in which a creditor is wrongfully induced by
> the debtor to transfer property or extend credit to the debtor....

> A false pretense is usually, but not always, the product of
> multiple events, acts or representations undertaken by a
> debtor which purposely create a contrived and misleading
> understanding of a transaction that, in turn, wrongfully
> induces the creditor to extend credit to the debtor. A "false
> pretense" is established or fostered willfully, knowingly and
> by design; it is not the result of inadvertence.

*Sterna v. Paneras (In re Paneras)*, 195 B.R. 395, 406 (Bankr. N.D. Ill. 1996) (*quoting Evans

v. Dunston (In re Dunston)*, 117 B.R. 632, 641 (Bankr. D. Colo. 1990), *aff'd in part, rev'd

in part*, 146 B.R. 269 (D. Colo. 1992)). *Accord John Deere Co. v. Broholm (In re Broholm)*,

310 B.R. 864, 872 (Bankr. N.D. Ill. 2004) (*quoting Paneras*).

False pretenses do not necessarily require overt misrepresentations. *Sarama*, 192

B.R. at 928. "Instead, omissions or a failure to disclose on the part of a debtor can constitute

misrepresentations where the circumstances are such that omissions or failure to disclose

create a false impression which is known by the debtor." *Id.* Silence or concealment may

-24-

constitute false pretenses. *Shelby Shore Drugs, Inc. v. Sielschott (In re Sielschott)*, 332 B.R.

570, 573 (Bankr. C.D. Ill. 2005); *Fosco v. Fosco (In re Fosco)*, 289 B.R. 78, 86 (Bankr. N.D.

Ill. 2002).

A false representation can be shown through conduct and does not require a spoken

or written statement. *Jairath*, 259 B.R. at 314. In other words, "[a] debtor's silence

regarding a material fact can constitute a false representation under § 523(a)(2)(A)." *Health

Benefit Plan v. Westfall (In re Westfall)*, 379 B.R. 798, 803 (Bankr. C.D. Ill. 2007). A

debtor's failure to disclose pertinent information may be a false representation where the

circumstances imply a specific set of facts and disclosure is necessary to correct what would

otherwise be a false impression. *Trizna & Lepri v. Malcolm (In re Malcolm)*, 145 B.R. 259,

263 (Bankr. N.D. Ill. 1992).

### b.    Actual Fraud

The Seventh Circuit Court of Appeals defined the term "fraud" for purposes of §

523(a)(2)(A) as follows:

> 'Fraud is a generic term, which embraces all the multifarious
> means which human ingenuity can devise and which are
> resorted to by one individual to gain an advantage over
> another by false suggestions or by the suppression of truth.
> No definite and invariable rule can be laid down as a general
> proposition defining fraud, and it includes all surprise, trick,
> cunning, dissembling, and any unfair way by which another
> is cheated.'

*McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000) (*quoting Stapleton v. Holt*, 250

P.2d 451, 453-54 (Okla. 1952)). "Actual fraud" is not limited to misrepresentation, but may

encompass "any deceit, artifice, trick, or design involving direct and active operation of the

-25-

mind, used to circumvent and cheat another[.]" *Id.* (internal quotation omitted). Hence, a

different analysis must be utilized when a creditor alleges actual fraud. *Id.* The *McClellan*

court opined that because common law fraud does not always take the form of a

misrepresentation, a creditor need not allege misrepresentation and reliance thereon to state

a cause of action for actual fraud under § 523(a)(2)(A). *Id.* Rather, the creditor must

establish the following: (1) a fraud occurred; (2) the debtor intended to defraud the creditor;

and (3) the fraud created the debt that is the subject of the discharge dispute. *Id.* at 894. The

fraud exception under § 523(a)(2)(A) does not reach constructive frauds, only actual ones.

*Id.* The existence of fraud may be inferred if the totality of circumstances presents a picture

of deceptive conduct by the debtor that indicates he intended to deceive or cheat the creditor.

*Cripe v. Mathis (In re Mathis)*, 360 B.R. 662, 666 (Bankr. C.D. Ill. 2006); *Sielschott*, 332

B.R. at 572.

### c.    Intent

Any cause of action under § 523(a)(2)(A)–false pretenses, false representation, or

actual fraud– requires proof that the debtor acted with intent to deceive. *Pearson v. Howard*

*(In re Howard)*, 339 B.R. 913, 919 (Bankr. N.D. Ill. 2006). Proof of intent to deceive is

measured by the debtor's subjective intention at the time of the transaction in which the

debtor obtained the money, property, or services. *Mega Marts, Inc. v. Trevisan (In re*

*Trevisan)*, 300 B.R. 708, 717 (Bankr. E.D. Wis. 2003); *see also CFC Wireforms, Inc. v.*

*Monroe (In re Monroe)*, 304 B.R. 349, 356 (Bankr. N.D. Ill. 2004). Therefore, subsequent

acts of fraud or omission do not demonstrate that the debtor had the requisite intent at the

time the representations were made. *Trevisan*, 300 B.R. at 717. "Where a person knowingly

-26-

or recklessly makes false representations which the person knows or should know will induce

another to act, the finder of fact may logically infer an intent to deceive." *Jairath*, 259 B.R.

at 315. Because direct proof of fraudulent intent is often unavailable, fraudulent intent may

be inferred from the surrounding circumstances. *Hickory Point Bank & Trust, FSB v. Kucera*

*(In re Kucera)*, 373 B.R. 878, 884 (Bankr. C.D. Ill. 2007); *Rezin v. Barr (In re Barr)*, 194

B.R. 1009, 1020 (Bankr. N.D. Ill. 1996). The determination of intent is a question of fact

to be decided by the bankruptcy court. *Howard*, 339 B.R. at 919.

### d.    Justifiable Reliance

The final element under § 523(a)(2)(A) requires a finding of causation. Reliance on

a false pretense, false representation, or actual fraud under § 523(a)(2)(A) must be

"justifiable." *Field v. Mans*, 516 U.S. 59, 74-75 (1995). Justifiable reliance is a less

demanding standard than reasonable reliance and requires only that the creditor did not

"blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had

utilized his opportunity to make a cursory examination or investigation." *Id.* at 71 (internal

quotation omitted). Justifiable reliance is an intermediate level of reliance that falls

somewhere between the more stringent "reasonable reliance" guidepost and the lenient

"reliance in fact." *Id.* at 74-75.

The justifiable reliance standard imposes no duty to investigate unless the falsity of

the representation is readily apparent. *Id.* at 70-72. Whether a party justifiably relies on a

misrepresentation is determined by looking at the circumstances of a particular case and the

characteristics of a particular plaintiff, not by an objective standard. *Id.* at 71; *Bombardier*

*Capital, Inc. v. Dobek (In re Dobek)*, 278 B.R. 496, 508 (Bankr. N.D. Ill. 2002). "[A] person

-27-

is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Mercantile Bank v. Canovas*, 237 B.R. 423, 429 (Bankr. N.D. Ill. 1998) (*quoting Field v. Mans*, 516 U.S. at 70). "However, a 'plaintiff may not bury his head in the sand and willfully ignore obvious falsehoods.'" *Johnston v. Campbell (In re Campbell)*, 372 B.R. 886, 892 (Bankr. C.D. Ill. 2007) (*quoting Zirkel v. Tomlinson (In re Tomlinson)*, Bankr. No. 96 B 27172, Adv. No. 96 A 1539, 1999 WL 294879, at *12 (Bankr. N.D. Ill. May 10, 1999)).

To satisfy the reliance element of § 523(a)(2)(A), the creditor must show that the debtor made a material misrepresentation that was the cause-in-fact of the debt that the creditor wants excepted from discharge. *Mayer v. Spanel Int'l Ltd. (In re Mayer)*, 51 F.3d 670, 676 (7th Cir. 1995) ("Reliance means the conjunction of a material misrepresentation with causation in fact."). *See also Westfall*, 379 B.R. at 805 (*citing Mayer*).

The Court can, and hereby does, take judicial notice of the orders and judgments entered in the Dallas County and Cook County Proceedings. *Opoka v. Immigration & Naturalization Serv.*, 94 F.3d 392, 394 (7th Cir. 1996) (holding that the decision of another court is "a proper subject of judicial notice"); *Grochocinski v. Spehar Capital, LLC (In re CMGT, Inc.)*, 384 B.R. 497, 506 (Bankr. N.D. Ill. 2008) (noting that, in ruling on a motion for judgment on the pleadings, courts may take judicial notice of matters of public record). The Court has also examined the additional exhibits admitted at trial and considered the stipulations submitted by the parties. The evidence presented falls short of establishing the requisite level of intent necessary under § 523(a)(2)(A) to determine that Burke actually intended to defraud ColeMichael.

-28-

In Count II of the complaint, ColeMichael contends that Burke's conduct, as alleged in the Dallas County Proceeding, constituted false pretenses, false representation, and actual fraud upon which ColeMichael relied to its detriment. The Court has already determined that the first amended complaint and the Final Default Judgment in the Dallas County Proceedings do not contain sufficient findings to satisfy the elements necessary to render the debt non-dischargeable under § 523(a)(2)(A). ColeMichael has not proffered any corroborating documentary or testimonial evidence to support the allegations that fraud created the debt that is the subject of this discharge dispute. Additionally, ColeMichael has not put forth evidence that Burke obtained the funds through false representations, surprise, trick, cunning, dissembling, or by any other unfair means. To conclude that Burke intended to defraud ColeMichael would inevitably require the Court to weigh evidence and draw inferences from the allegations of the first amended complaint and the Final Default Judgment that are not expressly supported in the record.

ColeMichael has proffered the participation agreement and Burke's written representations to Colemichael after the funds had been turned over to Burke pursuant to the participation agreement. (Ex. Nos. 1-11 & 13-14.) However, this evidence does not specifically focus on Burke's intentions before or at the time of the transaction when ColeMichael gave the funds to Burke. *See Standard Bank & Trust Co. v. Iaquinta (In re Iaquinta)*, 95 B.R. 576, 578 (Bankr. N.D. Ill. 1989) (noting that subsequent fraud or misrepresentation by the debtor is irrelevant). It is unclear whether at that time he intended to deceive ColeMichael or made any false representations knowingly or recklessly upon which ColeMichael justifiably relied. Because ColeMichael has not demonstrated by a

-29-

preponderance of the evidence that Burke had the requisite fraudulent intent, there can be no finding of false representation, false pretenses, or actual fraud for the purposes of dischargeability under § 523(a)(2)(A). Thus, Count II of the complaint is hereby dismissed.

### 2.        11 U.S.C. § 523(a)(4)

Section 523(a)(4) of the Bankruptcy Code provides that a debtor cannot discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]" 11 U.S.C. § 523(a)(4). The meaning of these terms is a question of federal law. *In re McGee*, 353 F.3d 537, 540 (7th Cir. 2003). In order for a creditor to prevail under § 523(a)(4), it must prove that a debtor committed (1) fraud or defalcation while acting as a fiduciary; or (2) embezzlement; or (3) larceny. 11 U.S.C. § 523(a)(4). Count III of ColeMichael's complaint alleges that the debt is based on Burke's acts while acting as a fiduciary. ColeMichael does not specifically allege embezzlement or larceny. Thus, the Court will not discuss the embezzlement or larceny prongs of tortious conduct proscribed under § 523(a)(4).

### a.        Express Trust or Fiduciary Relationship

A threshold inquiry is whether an express trust or a fiduciary obligation runs from Burke to ColeMichael under the facts of this matter. The existence of an express trust or fiduciary relationship is tested under federal law standards. *O'Shea v. Frain (In re Frain)*, 230 F.3d 1014, 1017 (7th Cir. 2000). An express trust requires an explicit declaration of trust, a clearly defined trust res, and an intent to create a trust. *Monroe*, 304 B.R. at 358. The intent to create a trust relationship is a key element in determining the existence of an express trust. *Id.*

-30-

A § 523(a)(4) cause of action can be based on a fiduciary relationship other than one arising from an express trust. *See Frain*, 230 F.3d at 1017; *In re Marchiando*, 13 F.3d 1111, 1115-16 (7th Cir.1994). "A fiduciary relationship may arise separate from an express trust, . . . but it is the substance and character of the debt relationship that determines whether such a fiduciary relationship exists." *Monroe*, 304 B.R. at 358. The Seventh Circuit has found that a fiduciary relationship exists for purposes of § 523(a)(4) when there is "a difference in knowledge or power between fiduciary and principal which . . . gives the former a position of ascendancy over the latter." *Marchiando*, 13 F.3d at 1116; *see also In re Woldman*, 92 F.3d 546, 547 (7th Cir. 1996) ("[S]ection 523(a)(4) reaches only those fiduciary obligations in which there is substantial inequality in power or knowledge. . . ."). For example, a lawyer-client relationship, a director-shareholder relationship, and a managing partner-limited partner relationship all require the principal to "'repose a special confidence in the fiduciary.'" *Frain*, 230 F.3d at1017 (*quoting Marchiando*, 13 F.3d at 1116). However, not all fiduciary relationships fall within the purview of § 523(a)(4). *Woldman*, 92 F.3d at 547. A fiduciary relation qualifies under § 523(a)(4) only if it "imposes real duties in advance of the breach. . . ." *Marchiando*, 13 F.3d at 1116. In other words, the fiduciary's obligation must exist prior to the alleged wrongdoing. *Id.*

### b.    Defalcation

"Defalcation" is not a defined term in the Bankruptcy Code. One court has defined defalcation within the context of § 523(a)(4) as "the misappropriation of trust funds held in any fiduciary capacity, and the failure to properly account for such funds." *Strube Celery & Vegetable Co., Inc. v. Zois (In re Zois)*, 201 B.R. 501, 506 (Bankr. N.D. Ill. 1996) (internal

-31-

quotation omitted); *see also Blackhawk B.M.X., Inc. v. Anderson (In re Anderson)*, 64 B.R.

331, 334 (Bankr. N.D. Ill. 1986). Defalcation has also been defined as " a failure to account

for money or property that has been entrusted to another." *Green v. Pawlinski (In re*

*Pawlinski)*, 170 B.R. 380, 389 (Bankr. N.D. Ill. 1994). An objective standard is used to

determine a defalcation, and intent or bad faith is not required. *Id.* Mere negligence does

not constitute defalcation.    *Meyer v. Rigdon*, 36 F.3d 1375, 1382-85 (7th Cir. 1994)

(construing defalcation under § 523(a)(4) and § 523(a)(11)). That is, although the Seventh

Circuit has not clearly defined the level of tortious conduct necessary to constitute a

defalcation in the context of § 523(a)(4), it has required something more than mere

negligence or mistake, but less than fraud. *Id.* at 1385; *Kress v. Kusmierek (In re*

*Kusmierek)*, 224 B.R. 651, 656-57 (Bankr. N.D. Ill. 1998). Some degree of culpability is

required to make a debt non-dischargeable as a defalcation under § 523(a)(4), *see Cent.*

*Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510, 511-12 (2d Cir. 1937), and a debtor's

knowledge is relevant, *see Chase Lumber & Fuel Co. v. Koch (In re Koch)*, 197 B.R. 654,

658-59 (Bankr. W.D. Wis. 1996). In sum, in order to establish that a debt is non-

dischargeable for reason of defalcation while acting in a fiduciary capacity, ColeMichael

must establish, by a preponderance of the evidence, the existence of an express trust or a

fiduciary relation and a debt caused by Burke's defalcation. *See Grogan*, 498 U.S. at 291;

*Woldman*, 92 F.3d at 547.

Here, ColeMichael has demonstrated by a preponderance of the evidence that Burke

was a fiduciary to ColeMichael. In addition to receiving a retainer from ColeMichael for his

services, it is undisputed that Burke served as legal counsel for the joint venture created by

-32-

the participation agreement. (Ex. No. 1; Stipulation (4/24/09) ¶ 9.)  Burke argues that he did

not act as ColeMichael's attorney.  However, "where an entity is by law an aggregate of

individuals, the lawyer has an attorney-client relationship with each of those individuals."

*Pucci v. Santi*, 711 F.Supp. 916, 927 n.4 (N.D. Ill. 1989).  The Court finds that because

Burke served as legal counsel for the joint venture, of which ColeMichael was a member,

and was in undisputed control over the funds paid to him by ColeMichael, Burke was in a

position of ascendency over ColeMichael.  Thus, a fiduciary relationship existed.  Indeed,

there was a significant and substantial difference in knowledge and power between Burke

and ColeMichael.  Burke received and unilaterally controlled the funds from ColeMichael

and subsequently mishandled and lost those funds.  He concealed the true reasons for the loss

from ColeMichael.

The participation agreement designated Burke as "legal counsel" for the joint venture

and allowed Bayvest to delegate all of its authority and obligations under the agreement to

Burke. (Ex. No. 1 §§ 3.1-3.2; Addendum A § 2.1.)  As legal counsel for the joint venture,

Burke had the authority and right to use bank accounts for the investment funds as he deemed

"NECESSARY IN ORDER TO BEST IMPLEMENT AND CARRY OUT THE PLAN" and

to transfer these funds to other accounts so long as he had "SIGNATORY AUTHORITY

OVER SUCH ACCOUNT." (Ex. No. 1 Addendum B § 2.4(4).)  The Letter of Instructions

was addressed to Burke as "LEGAL COUNSEL" and clearly specified Burke's duties owed

under the participation agreement.  (Ex. No. 1, Addendum B, Ex. No 1 Letter of

Instructions.)  Burke was entrusted with investment funds on the "express condition that

[Burke would] utilize and deal with the INVESTMENT AMOUNT in such manner as shall

-33-

ensure that [ColeMichael would] not suffer any loss or diminution in respect of the
INVESTMENT AMOUNT and to this end, [Burke would] not release the INVESTMENT
AMOUNT from [Burke's] control except in accordance with the provisions set out in
ADDENDUM 'B'...." (*Id.* ¶ 5.) Addendum B specifically instructed Burke to obtain bank
guarantees in exchange for any transfer or release of the investment funds. (Ex. No. 1,
Addendum B § 3.3(2).) Burke signed the Letter of Instructions as "Attorney and Counselor
of Law" and agreed to abide by the instructions. (Ex. No. 1, Addendum B, Ex. No. 1 Letter
of Instructions.) Burke admitted to receiving and holding ColeMichael's investment monies
in trust for use in the joint venture. (Ex. No. 25 p. 92 lines 6-12; p. 162 lines 17-21.)

Thus, the requisite fiduciary relationship existed between Burke and ColeMichael
because of the imbalance in the duties and responsibilities under the participation agreement,
as well as the difference of knowledge and power between the two parties. ColeMichael
reposed a special confidence in Burke to perform his duties and responsibilities under the
agreement, including, *inter alia*, the promise to deal with ColeMichael's investment in a
manner ensuring that ColeMichael would not suffer any loss or diminution. Hence, the
evidence establishes that a fiduciary relationship existed between Burke and ColeMichael
prior to the alleged wrongdoing by Burke.

Next, the Court finds that Burke engaged in acts of defalcation while acting within
the capacity of a fiduciary. Burke failed to properly account for all funds entrusted to him
to invest on behalf of ColeMichael pursuant to the participation agreement. Burke admits
that he improperly released ColeMichael's investment funds without justification. (Ex. No.
25 p. 96 lines 17-23, p. 164 lines 8-12.) Burke knowingly failed to obtain the requisite bank

-34-

guarantees and allowed investment funds to be released and allegedly stolen. Burke represented that he was acting on behalf of ColeMichael to obtain investment funds pursuant to the participation agreement. Instead, Burke admits that he acted on behalf of Bayvest to the detriment of ColeMichael and other investors. (Ex. No. 25 p. 94 lines 3-23, p. 95 lines 1-9, p. 96 lines 17-23.) Burke concealed the fact that ColeMichael's investment funds were allegedly stolen as a result of his release of the funds entrusted him and made no effort to locate stolen funds. (*Id.* p. 99 lines 9-24, p. 100 lines 1-3.) Burke repeatedly represented that he would pay ColeMichael funds due under the participation agreement. (Ex. Nos. 2-11, 13 & 14.) Burke and Bayvest further represented that they would make ColeMichael the beneficiary of a new investment plan with additional profits, but never did so. (Ex. No. 15 ¶ 20; Ex. No. 12; Ex. No. 25 p. 100 lines 1-3, p. 118 lines 2-11, p. 99 lines 23-23.) In the Cook County Proceedings, Burke continued to make misrepresentations regarding his intentions to repay the debt he owed ColeMichael pursuant to the Final Default Judgment. (Ex. No. 24 ¶¶ 42-45.) Burke failed to account for his activities and allowed records relating to the joint venture to be lost or destroyed. (Ex. No. 25 p. 75 lines 15-20, p. 89 lines 13-16.) This is more than sufficient to constitute defalcation for purposes of § 523(a)(4).

The evidence does not support the conclusion that Burke was merely negligent or did not know what he was doing. Burke was given ample opportunity to produce documents proving that the debt owed was not a result of his defalcation while acting as a fiduciary. As Burke made no credible attempt to account for the losses, his inability to account for the loss of investment funds constitutes defalcation. *See Buchholz v. Cook (In re Cook)*, 263 B.R. 249, 256 (Bankr. N.D. Iowa 2001). In sum, the Court finds that ColeMichael established by

-35-

a preponderance of the evidence a fiduciary relationship between it and Burke and a debt caused by the Burke's defalcation while acting as a fiduciary.

A review of the evidence in this matter leads the Court to conclude that ColeMichael was clearly injured by Burke's conduct. Pursuant to the Final Default Judgment, Burke was found to be jointly and severally liable with Bayvest to ColeMichael for $21,178,261 in damages. (Ex. No. 18 p. 3.) Burke has admitted to liability on the $21,178,261 debt created by the Final Default Judgment. (Ex. No. 21 ¶¶ 5-6 ("Agreed Order").) This admission establishes a causal connection between the damages suffered by ColeMichael and some acts or omissions on the part of Burke. ColeMichael has been deprived of the use of its money for many years. Since the entry of the Agreed Order in the Cook County Proceedings, witnesses with knowledge or information relating to the transactions at issue herein have died or become unavailable. (Stipulation (4/24/09) ¶ 87.) While the available evidence does not show Burke had the intent to defraud ColeMichael, it does demonstrate that Burke's actions clearly rose to the level of a defalcation while acting in a fiduciary capacity. Accordingly, the Court finds that the $21,178,261 principal debt reflected by the Final Default Judgment is non-dischargeable under § 523(a)(4).

            c.      **Dischargeability of Interest on the Final Default Judgment**

ColeMichael has established the validity of its claim and that the claim resulted from Burke's defalcation while acting in a fiduciary capacity. ColeMichael additionally asks this Court to find $28,175,996.21 in post-judgment (pre-petition) interest and $6,389,373.30 in

-36-

post-petition interest nondischargeable.[1]  The Dallas County District Court, in entering the

Final Default Judgment, awarded interest on the judgment at the rate of ten percent as

authorized by TEX. FIN. CODE ANN. § 304.001 (Vernon 1999).  (Ex. No. 18.)

Section 523(a)(4) exempts from discharge "any debt . . . for . . . defalcation while

acting in a fiduciary capacity. . . ."  11 U.S.C. § 523(a)(4).  A "debt" is a "liability on a

claim."  11 U.S.C. § 101(12).  A "claim," in turn, is broadly defined as a "right to payment,

whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent,

matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured. . . ."  11

U.S.C. § 101(5)(A).  This broad definition includes interest.  *In re Larson*, 862 F.2d 112, 119

(7th Cir. 1988); *Leahey v. United States IRS (In re Leahey)*, 169 B.R. 96, 98-99 (Bankr.

D.N.J. 1994).    Courts have found both pre-petition and post-petition interest non-

dischargeable under § 523 when the underlying debt is found to be non-dischargeable.

*Pierce v. Pyrtiz*, 200 B.R. 203, 206 (N.D. Ill. 1996); *see also Larson*, 862 F.2d at 119

("Pre-petition (or *matured*) interest has therefore been treated as part of the 'claim,' accorded

the same priority status as the underlying liability, and found nondischargeable where the

underlying liability is nondischargeable."); *Jabamoni v. Zordan (In re Zordan)*, Nos. 05 B

14742, 05 A 01711, 2006 WL 1791157, at *9 (Bankr. N.D. Ill. June 27, 2006) (finding

pre-judgment and post-judgment interest to be non-dischargeable).  Moreover, the Seventh

Circuit has made it clear that "[b]ankruptcy law enforces non-bankruptcy entitlements, unless

they are modified according to the Code."  *In re A.G. Fin. Serv. Ctr., Inc.*, 395 F.3d 410, 413

---

[1] The interest was calculated and compounded annually in accordance with TEX. FIN.
CODE ANN. § 304.006 (Vernon 1999).

(7th Cir. 2005). Therefore, because the debt reflected by the Final Default Judgment is non-dischargeable under § 523(a)(4), the Court finds that $34,565,369.51 in post-judgment interest (both pre-petition and post-petition) is also non-dischargeable.

### 3.    11 U.S.C. § 523(a)(6)

Section § 523(a)(6) of the Bankruptcy Code provides as follows:

> (a) A discharge under section 727 . . . of this title does not
> discharge an individual debtor from any debt–
>> (6) for willful and malicious injury by the
>> debtor to another entity or to the property of
>> another entity[.]

11 U.S.C. § 523(a)(6).

In order to be entitled to a determination of non-dischargeability of a debt under § 523(a)(6), a creditor must prove three elements by a preponderance of the evidence (1) that the debtor intended to and caused an injury to the creditor's property interest; (2) that the debtor's actions were willful; and (3) that the debtor's actions were malicious. *See Mulder*, 307 B.R. at 641; *Ardisson*, 272 B.R. at 356.

"The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). Under *Geiger* and its stringent standards, to satisfy the requirements of § 523(a)(6), a creditor must plead and prove that the debtor actually intended to harm him and not merely that the debtor acted intentionally and he was thus harmed. *See id.* at 61-62. In other words, the debtor must have intended the tortious consequences of his act. *See id.; see also Berkson v.*

-38-

*Gulevsky (In re Gulevsky)*, 362 F.3d 961, 964 (7th Cir. 2004). Injuries either negligently or

recklessly inflicted do not come within the scope of § 523(a)(6). *Geiger,* 523 U.S. at 64.

The Supreme Court did not define the scope of the term "intent" utilized to describe

willful conduct. Recent decisions, however, have found that either a showing of subjective

intent to injure the creditor or a showing of a debtor's subjective knowledge that injury is

substantially certain to result from his acts can establish the requisite intent required by

*Geiger. See Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 463-65 (6th Cir.1999);

*Tex. By & Through Board of Regents of Univ. of Tex. Sys. v. Walker*, 142 F.3d 813, 823 (5th

Cir.1998); *Su v. Carrillo (In re Su)*, 259 B.R. 909, 913 (9th Cir. BAP 2001); *Fidelity Fin.*

*Servs. v. Cox (In re Cox)*, 243 B.R. 713, 719 (Bankr. N.D. Ill. 2000). Because a person will

rarely admit to acting in a willful and malicious manner, those requirements must be inferred

from the circumstances surrounding the injury. *Cutler v. Lazzara (In re Lazzara)*, 287 B.R.

714, 723 (Bankr. N.D. Ill. 2002).

An act is "malicious" if it is taken "in conscious disregard of one's duties or without

just cause or excuse. . . ." *Thirtyacre*, 36 F.3d at 700. The test for maliciousness under §

523(a)(6) is (1) a wrongful act, (2) done intentionally, (3) which causes injury to the creditor,

and (4) is done without just cause and excuse. *Paul*, 266 B.R. at 696. A debtor does not

have to act with ill will or a specific intent to do harm to the creditor for the conduct to be

malicious. *Thirtyacre*, 36 F.3d at 700. Whether an actor behaved willfully and maliciously

is ultimately a question of fact reserved for the trier of fact. *Id.*

The Court cannot make the requisite findings under *Geiger* based on the parties'

stipulations and the evidence presented. Even though his actions caused injury to

-39-

ColeMichael, there is no evidence to suggest that Burke intended to cause injury or that the injury itself was deliberate or intentional. The Court cannot infer that Burke's actions were intentional and not merely reckless or that he intended to injure the property interests of ColeMichael and caused it harm at the time of the wrongful conduct. Indeed, a fair summary of Burke's testimony attributes the loss of ColeMichael's funds to Burke being deceived by others. (Ex. No. 25 p. 67 lines 5-10, p. 88 lines 2-7, p. 94 lines 1-14, p. 96 line 17-23.)

For the same reasons the Court found that Burke's actions did not rise to the level of a fraud, it further finds that the evidence does not show that Burke intended the injury that resulted from his failure to distribute funds pursuant to the participation agreement. Therefore, ColeMichael has failed to demonstrate that its injury arose out of a "willful" and "malicious" act of Burke. *See Geiger*, 523 U.S. at 61-62. Accordingly, Count IV of the complaint is hereby dismissed.


## IV. CONCLUSION

For the foregoing reasons, the Court hereby enters judgment on Count III of the complaint in favor of ColeMichael. The debt reflected by the Final Default Judgment, together with post-judgment interest (both pre-petition and post-petition), a total amount of $55,743,630.51, is non-dischargeable under § 523(a)(4). Counts I, II, and IV of ColeMichael's complaint are dismissed.

-40-

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.

**ENTERED:**

DATE: ___6/10/9___      _____
                        John H. Squires
                        United States Bankruptcy Judge

cc:     See attached Service List

## SERVICE LIST

### ColeMichael Investments, LLC v. Barry E. Burke
**Adversary Case No. 08 A 00252**

Luke DeGrand, Esq.
Tracey L. Wolfe, Esq.
DeGrand & Wolfe, P.C.
20 S. Clark Street, Suite 2620
Chicago, IL 60603

Thomas N. Auwers, Esq.
Heller & Richmond, Ltd.
33 N. Deaborn Street, Suite 1600
Chicago, IL 60602

David R. Brown, Esq.
Springer, Brown, Covey, Gaertner & Davis
400 S. County Farm Road, Suite 330
Wheaton, IL 60187

William T. Neary, United States Trustee
219 S. Dearborn Street
Suite 873
Chicago, IL 60604